## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| KAREN S. LEE, | ) |
| | ) Case No. 3:19-cv-2942 |
| Plaintiff, | ) |
| | ) JUDGE JAMES G. CARR |
| vs. | ) |
| | ) MAGISTRATE JUDGE |
| COMMISSIONER OF | ) CARMEN E. HENDERSON |
| SOCIAL SECURITY | ) |
| | ) REPORT AND RECOMMENDATION |
| Defendant. | ) |

## I.      Introduction

Plaintiff, Karen S. Lee, seeks judicial review of the final decision of the Commissioner of Social Security, Andrew Saul, denying her application for disability insurance benefits under Title II of the Social Security Act. This matter is before me under 42 U.S.C. § 405(g) and Local Rule 72.2(b). Because the ALJ followed proper procedures and his decision is supported by substantial evidence, I recommend that the Commissioner's final decision denying Lee's application for disability insurance benefits be AFFIRMED.

## II.     Procedural History

### A.      The First Decision

Lee filed for disability insurance benefits on May 7, 2015. (ECF No. 11 at 20). She alleged a disability period that began on February 1, 2014. (ECF No. 11 at 20). The Ohio Division of Disability Determination (the "State Agency") initially denied her claim on August 19, 2015, and denied it again at the reconsideration stage on October 20, 2015. (ECF No. 11 at 20). The following week, Lee requested a hearing before an ALJ. (ECF No. 11 at 20). ALJ Earl Ashford presided over Lee's hearing on September 26, 2017. (ECF No. 11 at 20). Lee appeared with counsel and testified.

(ECF No. 11 at 20, 41-64). Norman Mastbaum testified via telephone as an impartial vocational expert. (ECF No. 11 at 20, 64-67). The ALJ issued his determination on October 23, 2017, in which he determined that Lee was not disabled under the Social Security Act. (ECF No. 11 at 17-33). Lee asked the Appeals Council to review and set aside the ALJ's ruling on November 22, 2017, but the Appeals Council denied her request on May 1, 2018; thus, Lee's administrative decision was final as of that date. (ECF No. 11 at 6-8).

### B.      District Court and Appeals Council Remand

Lee then appealed to this Court. On November 26, 2018, Lee and the Commissioner jointly moved this Court to remand Lee's case for new administrative proceedings. (ECF No. 11 at 606-07). The Court remanded it. (ECF No. 11 at 609-10).

The Appeals Council remanded the case to the ALJ, stating that

> The U.S. District Court for the Northern District of Ohio (Civil Action Number 3:18-CV-01504) has remanded this case to the Commissioner of Social Security for further administrative proceedings in accordance with the fourth sentence of Section 205(g) of the Social Security Act.

> The Appeals Council hereby vacates the final decision of the Commissioner of Social Security and remands this case to an Administrative Law Judge for resolution of the following issue:

>> The decision does not contain an adequate evaluation of the opinion evidence. In weighing the opinions of State Agency reviewing physicians and psychologists, Michael Lehv, M.D., Bradley Lewis, M.D., Paul Tangeman, Ph.D., and Kristen Haskins, Psy.D. at Exhibits 1A and 3A, the Administrative Law Judge stated he gave significant weight to their conclusions that the claimant does not have any exertional limitations and is able to work at a low stress job with only occasional need for social interaction due to a mild to moderate level of mental health related impairment (Decision, page 11). However, the Administrative Law Judge found less restrictive limitations than the State Agency

physicians opined, but provided no explanation for not adopting a number of limitations opined by them (Decision, page 5).

Specifically, the residual functional capacity determination and hypothetical example presented to the vocational expert imposed limitations to a full range of work at all exertional levels but with the following non-exertional limitations: Work in low stress jobs, defined as having occasional decision making required, occasional changes in the work setting, with no strict production quotas. Occasional interaction with the general public, coworkers, and supervisors. (Finding No. 5). However, despite giving significant weight to the State Agency reviewing opinions, without explanation, the Administrative Law Judge did not accommodate all the limitations opined by those physicians, including no climbing of ropes, ladders, or scaffolds (Exhibit lA/8); and no exposure to hazards (Exhibit lA/9). In addition, the Administrative Law Judge did not accommodate or discount opined limitations that the claimant could perform one to four simple and multistep tasks; can interact with the general public, coworkers, and supervisors in brief/superficial and occasional manner (Exhibits lA/12 and 3A/10); is able to adapt to routine changes in the workplace but may need explanation beforehand (Exhibit lA/12); has the ability to attend, concentrate, and persist in a setting that has short cycle tasks at most moderate pace demand (Exhibit 3A/10); has the ability to adapt to routine changes in the workplace that has at most moderate time and production demand; and has limitations due to emotional factors that challenge coping skills and stress tolerance (Exhibit 3A/11). Further evaluation of the opinion evidence is warranted.

Upon remand, the Administrative Law Judge will:

• Give further consideration to the nonexamining source opinions pursuant to the provisions of 20 CFR 404.1527 and explain the weight given to such opinion evidence.

• Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific

references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Ruling 85-16 and 96-8p).

• If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

In compliance with the above, the Administrative Law Judge will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record, and issue a new decision.

(ECF No. 11 at 612-13).

## C.    The Second Decision

The ALJ held a supplemental hearing on September 9, 2019. (ECF No. 11 at 521). Lee again appeared and testified. (ECF No. 11 at 521, 543-53). James V. Lopez appeared via telephone as an impartial vocational expert. (ECF No. 11 at 521, 553-58). On September 20, 2019, the ALJ filed his again-unfavorable decision. (ECF No. 11 at 521-34). Lee did not appeal the ALJ's second decision to the Appeals Council; however, she initiated this Court's review on December 12, 2019. (ECF No. 1).

## III.    Relevant Background

Lee does not allege that the ALJ failed to include material facts or parsed the record; therefore, the ALJ's factual, testimonial, and opinion summaries suffice for this case.

4

**A.**     Medical Evidence

Turning to the medical evidence, in February of 2014 the claimant complained of feeling light headed, dizzy, and panicky with difficulty sleeping and a decreased appetite (4F:13). An examination complete at that time, was unremarkable and noted to the claimant to be alert and fully oriented (4F:13). The claimant was diagnosed with an acute panic attack, general anxiety disorder/sleep disorder and was prescribed Citalopram and Lorazepam (Id.). Office notes from March and April indicate that the claimant's symptoms had improvement (4F:13-13). In April, the claimant was reportedly off Citalopram and had failed to start Viibryd for her mental health symptoms (4F:11). Exam notes from that time observe the claimant to be alert and fully oriented, but was otherwise unremarkable (4F:11). The claimant was noted to be noncompliant with therapy; however, she was also observed to be alert and fully oriented 4F:11).

In August of 2014, the claimant complained of sweaty hands, feet, and underarms (2F:3). At that time, the claimant was reportedly taking Zyprexa and Clonazepam (Id.). In October, the claimant was seen by Dr. Fotouhi for complaints of hyperhidrosis of the upper and lower extremities (1F:3). At that time, the doctor recommended a robot assisted thorascopy with sympathectomy; however, the claimant later declined the procedure (1F:5). Office note from November, indicate the claimant was smoking marijuana after work to help control her hyperhidrosis, which was reportedly working (4F:9).

An examination completed in January of 2015, was entirely unremarkable (4F:8). The undersigned notes that during this visit the claimant's judgment and insight were noted to be in tack, she was observed to be fully oriented, and showed "no evidence of anxiety, depression, agitation" and her recent and remote memory was normal (4F:8). In February, Dr. Wehri reportedly "discouraged" the claimant was attempting to go on social security disability (4F:6). Treatment records from March of 2015 indicate the claimant was sleeping well and that her appetite was good (4F:5). Office notes from that same month indicate the claimant never got the prescription for Metoprolol that the doctor had been trying to get the claimant to fill for two months and that the claimant was claiming that the prescription was lost (4F:5). Furthermore, the claimant was "not following her regiment like she is supposed to" (4F:6). At that time, the claimant also requested another work slip allowing her to remain off work for another month (Id.). The claimant was provided a work slip indicating she should be off work from February 12, through April 27, of 2015 (4F:5). In April, Dr. Wehri, the claimant's

primary care physician, referred the claimant to Dr. Kuhlman for treatment of her hyperhidrosis (3F:4). At that time, the claimant was reportedly taking medications for her anxiety and bipolar, which reportedly helped with her severe hyperhidrosis (3F:4). The claimant reported that she was taking Paroxetine, Olanzapine, Clonazepam and Metoprolol (3:5). During the examination, the doctor noted that the claimant "did not demonstrate any significant unusual behaviors" and that her cognition was good (3F:6). Although the claimant's reflexes, strength, sensation and gait were normal, severe hyperhidrosis was noted in the axilla, palmar aspects of the hands, fingers, and thumb, and palmar aspects of the feet and toes (3F:6). The undersigned notes that no hyperhidrosis was noted along the dorsal aspect of the hands and feet (Id.). Dr. Kuhlman sought approval for Botox injections; however, the claimant's insurance denied the request (4F:3).

The claimant was also seen by Dr. Wehri in April of 2015 for complaints of anxiety and depression (4F:4). With the exception of noting the claimant's sweaty hands, the physical examination completed at that time was unremarkable (4F:4). Exam notes from May indicated that the claimant had excessively sweaty palms and seemed anxious; however, the remainder of the exam was unremarkable (4F:3). At that time, the claimant was provided a notice indicating that she was cannot work from May 26 through August 26, of 2015 (4F:3).

In July, the claimant underwent a psychological consultative examination (5F). The claimant reported that her sleep and appetite were varied and that she was irritable, with passive suicidal ideations; however, no plan or intent (Id.). Additionally, the claimant stated that she experiences daily panic attacks that involve sweating, trembling, fear of death and shaking, which reportedly last up to one hour (Id.). At that time, the claimant indicated that she was not involved with the mental healthcare system and that her psychiatric medications were being managed by her primary care physician (Id.). She reported that she is able to manage her medications and finances, and shop in stores without difficulty (5F:4). Additionally, she stated that she enjoys watching television, listening to music, accessing the internet and swimming (Id.). At that time, she also reported having weekly interactions with her daughters and that she sees her friends "every other day" (Id.). Upon examination, the claimant was observed to be cooperative; however, her eye contact was limited with a down cast facial expression, she had a teary affect and exhibited a nervous laughter (5F:4-5). The consultant noted that no outward physical symptoms of hyperhidrosis, such as sweating, were observed (5F:5). Her speech

6

was reportedly normal and she was observed to follow the conversation and did not appear easily distracted (Id.). The claimant was noted to be alert, responsive, and fully oriented and no autonomic or motoric indications of anxiety were noted (5F:5). The consultant diagnosed the claimant with conversion disorder (5F:6).

Office notes from October indicate the claimant was referred to an endocrinologist due to abnormalities in her Catechols with a possibility of pheochromocytoma as a cause of her anxiety and hyperhidrosis (9F:10). Office notes from the next month indicate that the appointment "has continued to be put off" (Id.). The undersigned notes that office notes from October and November make no mention of the claimant's mental health status (Id.). Office notes from January of 2016 indicate that the claimant had yet to see the endocrinologist (9F:3). The claimant was again noted to be alert and fully oriented and her medications were continued (Id.). In March, the claimant was observed to have dry palms (9F:2).

In August of 2016, the claimant was seen by doctor Alele, an endocrinologist (10F:7-10). At that time, the claimant was observed to be cooperative and in no distress (10F:9). Upon examination her skin was noted to be warm and dry with no hyperpigmentation, vitiligo, or suspicious lesions and she was observed to be alert, fully oriented with normal speech, muscle tone, and strength (10F:10). The claimant was diagnosed with unexplained leukocytosis and hyperhidrosis (Id.).

In March of 2017, the endocrinologist noted that the claimant was taking Paxil, which "can certainly cause excessive sweating" (10F:16). The doctor recommended that the claimant consider a second endocrine option as well as consider being treated by a dermatologist, preferable a tertiary (Id.). Upon examination the claimant's skin was again noted to be warm and dry with no hyperpigmentation, vitiligo, or suspicious lesions and she was observed to be alert, fully oriented with normal speech, muscle tone, and strength (10F:19). The claimant was subsequently referred to dermatology (Id.). During an April follow up visit with her primary care physician, the claimant reported requested a stronger does of Paroxetine to help with sleep however, no mental status examination was noted (13F:3). Office notes from July indicate the claimant had undergone breast augmentation (13F:4). An examination of the claimant performed at that time noted her skin to be normal and no evidence of anxiety, depression, or agitation were observed and her memory was normal (13F:4). Additionally, she was observed to be alert, fully oriented, and her judgment and insight was reportedly intact (13F:4). Office notes from October of 2017 indicate that the

7

claimant was scheduled to see doctor Strobel for mental health treatment (14F:6). Exam notes from that time were unremarkable (14F:6). In November, the clamant was seen for complaints of right hand pain (14F:5). An examination of the claimant's right hand revealed tenderness over the third and fourth metacarpal bones; however, there was no mention hyperhidrosis (14F:5).

In January of 2018, the claimant reported that she was feeling internally shaky and did not feel her Clonazepam was strong enough (14F:5). Upon examination, the claimant was noted to be alert and fully oriented (14F:5). That same month the claimant was seen by Dr. Strobel for an initial evaluation (15F:1). The doctor diagnosed the claimant with panic disorder without agoraphobia and bipolar disorder (15F:5). Office notes from February indicate the claimant was watching her grandchildren two days a week and that she was going to the grocery store two to three times per week (15F:6, 7). The doctor also notes that the claimant was reportedly able to visit her cousin and would go to the bar next door, drink, and stumble home; however, records indicate she never goes by herself (15F:7). Office notes from March, indicated the claimant was feeling "satisfactorily: and that she was taking her medications regularly (14F:4). In May, the claimant had reportedly broken up with her boyfriend; however, the record indicates that five different men had offered to take her on a date (15F:9). At that time, she reported that her hyperhidrosis was not as bad because she was worrying less and her appetite and sleep were reportedly good (15F:10). At the time, she rated her anxiety at a five out of ten and indicated that marijuana was helped to reduce her stress (Id.). Additionally, the claimant reported that she had not had a panic attack in the last month because she was note dwelling on things (15F:11).

Office notes from July indicate the claimant had found a new boyfriend (15F:13). At that time, she reported that she was cleaning her new boyfriend's house and playing with her granddaughter for exercise (Id.). The claimant reported that her appetite was good, she was getting at least six hours of sleep per night and she was driving more (15F:14). Additionally, the claimant reported that she had not had any panic attacks in the last two months and that hyperhidrosis was less of a problem (Id.).

In August, the claimant was observed to be fully oriented with no evidence of anxiety, depression, or agitation, her memory was normal and her judgment and insight were observed to be intact (14F:3). That same month the claimant reported that she was having anxiety two to three times per week in the morning, which lasted about one hour (15F:16). She also reported that she was eating and

sleeping well and that she was jumping on a trampoline with her granddaughter for exercise (15F:17). Additionally, she indicated that she enjoyed going on Facebook

In January of 2019, the claimant reported that she was having trouble remembering things (14F:1). Office notes from February of 2019, indicate that the claimant had returned to an old boyfriend who had recently quit using drugs and was reportedly going to counseling three times per week (15F:29).

(ECF No. 11 at 527-30).

### B.    Testimonial Evidence

The claimant applied for supplemental security income and disability benefits alleging that she has been unable to work due to hyperhidrosis, anxiety, panic attacks, bipolar, and depression (4E). In June 2015, the claimant reported that her hyperhidrosis (sweating) is intensified with anxiety and being around groups of people. She reports that this also causes panic attacks. The claimant is unable to "touch anything" due to her hands being wet with sweat, which she indicated causes limitation with lifting. However, she is able to perform a range of household chores including meal preparation. She reports difficulty with concentration and focus, although is able to follow instructions (5E). In August 2015, the claimant reported feeling faint and dizzy with an increase of panic and anxiety attacks (7E). Again in October 2015, the claimant reported a worsening in condition overall including mood swings. She stated, "friends and family keep telling me that I need to seek medical treatment" (9E). Despite complaints of severe mental health related symptoms, resulting in an inability to work, the claimant has not sought professional mental health care, following only with her primary care provider for refills of psychotropic medication. The claimant's prescribed medications include olanzapine (Zyprexa); Clonazepam (Klonopin); metoprolol (Toprol); and paroxetine (Paxil). (16E; 10F).

The claimant testified that he[r] hands, feet, and armpits sweat constantly (Hearing Testimony). She reported that it affects her body temperature and prevents her from holding her grandchildren's hand (Id.). She indicated that she has undergone surgical procedures and utilized topical creams in attempt to alleviate her chronic sweating (Id.). The claimant stated that she takes a rag with her to help dry her hands off (Id.). Regarding her anxiety, the claimant testified that she shakes, becomes nauseous, and has difficult getting her words out (Id.). She indicated that she is currently seeing Dr.

Strobel and believes it helps while she is there (Id.). The claimant testified that her medications make her tires or "not fully awake" (Id.). She stated that she experiences short-term memory loss, and that her concentration in poor (Hearing Testimony). Regarding her depression, the claimant testified that she has her "ups and downs" (Id.). More specifically, the claimant stated that two weeks prior to the hearing she was experiencing and "up" where she was awake for two weeks with no sleep; however, she later reported she was occasionally able to take thirty minutes (Id.). This was followed by a "down" period where she slept for two days (Id.). The claimant testified that she has the television on while at home; however, she has difficulty "getting into it" (Hearing Testimony). The claimant reported that she is able to speak with others on the phone and will shop for groceries; however, she reported she becomes anxious while shopping (Id.). She indicated that she has dropped items around the house; however, she denied dropping items while shopping in a store (Hearing Testimony). The claimant reported that she will become "extremely anxious" around people and that she will run to a bathroom to try to calm down (Hearing Testimony). Although she was able to drive to the hearing, the claimant indicated that she needs to keep drying her hands or they will slide on the steering wheel (Hearing Testimony)…

(ECF No. 11 at 526-27).

### C.    Opinion Evidence

#### 1.    Wehri

Turning to the opinion evidence, the opinion found in the Family Medical Leave Act form completed by Dr. Wehri is given little weight, as it is internally inconsistent and is unsupported by the record (4F:37-40). More specifically, the doctor states that the claimant cannot work due to anxiety caused by hyperhidrosis (Id.). Statements that a claimant is "disabled," "unable to work," "cannot perform a past job," "meets a listing," or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner, who cannot abdicate the statutory responsibility to determine the ultimate issue of disability. Thus, the opinion that the claimant cannot work is given little weight. Additionally, the doctor's opinion is internally inconsistent with his noted observations. The doctor frequently indicates in his treatment of the claimant that she is alert and fully oriented, without mention of any other observable mental health symptom. Because the doctor's opinion is internally inconsistent

10

and is on an issue reserved to the Commissioner, the doctor's opinion is given little weight. Consistent with the record as a whole, the above residual functional capacity limits the claimant to no climbing of ladders, ropes, or scaffolds and no exposure to hazards, such as dangerous moving machinery and unprotected heights. She can frequently, but not constantly, engage in work activities that challenge coping skills and stress tolerance, after being provided with explanations of the work process. She is able to attend, concentrate, adapt, and persist in a setting that has short cycle tasks, with routine changes in a workplace that has at most moderate time, pace and production demands. Work limited to simple, routine, and repetitive tasks. Brief, superficial, occasional interaction with the general public, coworkers, and supervisors.

The undersigned also notes that Dr. Wehri provided numerous notes indicating the claimant was to be off work for various periods of time (4F). These notes are given little weight, as they are limited in their duration and provide no functional analysis as to what limitations prevented the claimant from working (Id.).

…

The Residual Functional Capacity Form and Medical Source Statement completed by Dr. Wehri are given some weight, as they are somewhat consistent with the record (7F; 16F). More specifically, the doctor indicates that the claimant is able to stand, walk, and/or sit for eight hours each, throughout the workday (Id.). This aspect of the doctor's opinion is given great weight, as the record lacks any evidence of limitation in these areas. The doctor's opinion that the claimant would require unscheduled breaks every fifteen minutes for up to five minutes is entirely unsupported by the record as a whole and is internally inconsistent with his own records (Id.). Similarly, the doctor opines that the claimant is limited to lifting up to ten pounds occasionally and can only handle and finger bilaterally for up to 5% of the workday and is able to reach bilaterally for up to 10% of the workday (Id.). The doctor attributes this significant limitation to the claimant's hands sweating constantly; however, the claimant reported that she has never dropped an item while shopping and indicated that's she is able to perform her household chores. Additionally, the record lacks any testing performed by the doctor that would support a limitation in this area. Therefore, the doctor's opinion regarding the claimant's ability to handle, finger, and reach is given little weight. Finally, the doctor opines that the claimant would be absent from work more than four times per month (Id.). Consistent with the record as a whole, the above residual functional capacity limits the claimant to

11

frequently, but not constantly, engage in work activities that challenge coping skills and stress tolerance, after being provided with explanations of the work process. She is able to attend, concentrate, adapt, and persist in a setting that has short cycle tasks, with routine changes in a workplace that has at most moderate time, pace and production demands. Work limited to simple, routine, and repetitive tasks. Brief, superficial, occasional interaction with the general public, coworkers, and supervisors.

The Mental Capacity Assessment completed by Dr. Wehri, is given little weight, as it is an opinion on an area outside of his expertise and is unsupported by the record as a whole (8F). More specifically, the doctor opined that the claimant has marked limitations in social interaction with an extreme limitation in her ability to perform at a consistent pace with a standard number of breaks (Id). Additionally, he opined that the claimant would have moderate to marked limitations in concentration and persistence (Id.). Finally, the doctor opined that the claimant would be absent more than four times per month (ID.). At the outset, Dr. Wehri's education as a general practitioner may have included some training regarding mental health treatment, there is no indication that he has specialized training in mental health treatment. Additionally, his opinion is in sharp contrast to other opinions contained in the record that were issued by individuals who specialize in mental health treatment. Because the doctor's opinion is on a matter beyond his expertise and it is inconsistent with the record as a whole, it is given little weight. Consistent with the record as a whole, the above residual functional capacity limits the claimant to frequently, but not constantly, engage in work activities that challenge coping skills and stress tolerance, after being provided with explanations of the work process. She is able to attend, concentrate, adapt, and persist in a setting that has short cycle tasks, with routine changes in a workplace that has at most moderate time, pace and production demands. Work limited to simple, routine, and repetitive tasks. Brief, superficial, occasional interaction with the general public, coworkers, and supervisors.

(ECF No. 11 at 530-31).

### 2.      Barwick

The opinion of the psychological consultative examiner is given some weight, as it is somewhat consistent with the record as a whole. More specifically, the consultant indicate[d] that the claimant's [sic] retains the ability to understand, remember, and carry out instructions and can respond appropriately to supervision and coworkers (5F:7). The consultant opined that the claimant may

struggle with maintaining attention, concentration, persistence, or pace and with responding appropriately to work pressures (ID.). Although consistent with consultant's objective findings, the undersigned finds that the record[] supports further limiting the claimant. Consistent with the record as a whole, the above residual functional capacity limits the claimant to frequently, but not constantly, engage in work activities that challenge coping skills and stress tolerance, after being provided with explanations of the work process. She is able to attend, concentrate, adapt, and persist in a setting that has short cycle tasks, with routine changes in a workplace that has at most moderate time, pace and production demands. Work limited to simple, routine, and repetitive tasks. Brief, superficial, occasional interaction with the general public, coworkers, and supervisors.

(ECF No. 11 at 530-31).

### 3.       State Agency Consultants

The opinion of the state agency medical consultant at the initial level is given great weight as it is consistent with the record as a whole (1A). More specifically, the consultant opine that the claimant has no exertional limitations; however, she is limited to no climbing of ladders, ropes, or scaffolds and she should avoid all exposure to hazards (Id.). This opinion is consistent with the claimant's diagnosis of hyperhidrosis and is supported by the record as a whole. Consistent with this opinion and the record as a whole, the residual functional capacity above limits the claimant to no climbing of ladders, ropes, or scaffolds and no exposure to hazards, such as dangerous moving machinery and unprotected heights.

The opinion of the state agency medical consultant at the reconsideration level is given less weight, as the opinion is inconsistent with the record as a whole (3A). More specifically, the consultant opined that the claimant's physical, medically determinable impairments were not severe (Id.). The consultant seemingly based is opinion on the psychological consultative examination which noted no visible sweating (Id.). Considering the record as a whole, the undersigned finds that further limitations are warranted. Consistent with the record as a whole, the residual functional capacity above limits the claimant to no climbing of ladders, ropes, or scaffolds and no exposure to hazards, such as dangerous moving machinery and unprotected heights.

The opinions of the state agency psychological consultant at the initial and reconsideration levels are given great weight, as they are

supported by the record as a whole (1A; 3A). More specifically, the consultants opined that the claimant is able to attend, concentrate, and persist in a setting that has short cycle tasks and, at most, a moderate pace demand; she is able to interact with the general public, coworkers and supervisors in a brief, superficial, and occasional manner; and she can adapt to routine changes in the workplace that has, at most, a moderate time and production demand (Id.). Consistent with the record as a whole, the above residual functional capacity limits the claimant to frequently, but not constantly, engage in work activities that challenge coping skills and stress tolerance, after being provided with explanations of the work process. She is able to attend, concentrate, adapt, and persist in a setting that has short cycle tasks, with routine changes in a workplace that has at most moderate time, pace and production demands. Work limited to simple, routine, and repetitive tasks. Brief, superficial, occasional interaction with the general public, coworkers, and supervisors.

(ECF No. 11 at 532).

## IV.    The ALJ's Decision

As is relevant here, the ALJ issued the following findings of fact and narrative analysis:

3.      The claimant has the following severe impairments: Anxiety / panic disorder; conversion reaction; hyperhidrosis, status-post surgery; depression, bipolar and seasonal affective disorder (20 CFR 404.1520(c))…

In addition to the claimant's severe impairments, she also has nonsevere impairments… Specifically, the claimant has been diagnosed with sleep apnea, leukocytosis, and vitamin D deficiency…

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)…

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: Postural limitation of no climbing of ladders, ropes, or scaffolds. Environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights. The claimant can frequently,

14

but not constantly, engage in work activities that challenge coping skills and stress tolerance, after being provided with explanations of the work process. Is able to attend, concentrate, adapt, and persist in a setting that has short cycle tasks, with routine changes in a workplace that have at most moderate time, pace and production demands. Work limited to simple, routine, and repetitive tasks. Brief, superficial, occasional interaction with the general public, coworkers, and supervisors…

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform…

11.    The claimant has not been under a disability … from February 1, 214, through the date of this decision…

(ECF No. 11 at 524-34).

## V.    Assignments of Error

Lee sets forth two assignments of error here. First, Lee asserts that "the ALJ's decision to discredit the opinions of the treating source was not supported by [substantial] evidence." (ECF No. 12 at 7 (styling edited)). Lee refines that issue by stating that "the ALJ did not provide sufficient reasoning" for the weight he accorded to Wehri's opinions. (ECF No. 12 at 8). Second, Lee asserts that "the ALJ's analysis of the consultative examiner is inconsistent with the ultimate findings of the decision." (ECF No. 12 at 14 (styling edited)). Lee focuses that statement on the ALJ's "credit[ing] the consultative examiner as reliable and then ignor[ing Lee's] limitations in rendering his final decision." (ECF No. 12 at 14).

## VI.    Law and Analysis

### A.    Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a

scintilla" of relevant evidence; a reasonable person "might accept [it] as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "It is well established that the party seeking remand bears the burden of showing that a remand is proper…" *Oliver v. Sec'y of Health and Hum. Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence; if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). The decisive question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the court must affirm the Commissioner's findings, even if the court does not agree with the Commissioner's decision, or substantial evidence exists to support an alternative result. *Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Despite this deference, a court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards—"fails to follow its own regulations"—unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). Legal error is harmless if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* And the court will not remand a case for further administrative proceedings absent prejudice on

16

the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and logical bridge between the evidence and the result," then the court cannot uphold the ALJ's decision, even one supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other 6th Circuit District Courts follow *Sarchet*'s logical-bridge requirement[1] because it ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B.      The ALJ's Analysis of Wehri's Opinions**

Lee's first assignment of error concerns Wehri's various medical-source statements. Lee

---

[1] *E.g. Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

primarily objects to the ALJ's rationale that Wehri's opinions are internally inconsistent. (ECF

No. 12 at 7). To that end, Lee asserts that

> Dr. Wehri consistently opines that Ms. Lee is significantly limited
> in her ability to maintain regular attendance in the workplace, that
> Ms. Lee will be absent from work multiple days each month, and
> will need breaks beyond what is typical in competitive employment.
> [Wehri] also consistently identifies concentration and attention
> limitations. In all, Dr. Wehri's opinions with regards to Ms. Lee's
> limitations are internally consistent across the board, and the ALJ's
> determination of the contrary is not an accurate reading of the record
> taken as a whole.
>
> Beyond a consistent set of opinions with regards to Ms. Lee's
> limitations, Dr. Wehri also diagnoses Ms. Lee with the same
> impairments in every medical record he provides.
>
> …
>
> After examining the record in its entirety, it is impossible to say that
> Dr. Wehri's opinions or diagnoses are internally inconsistent as the
> ALJ suggests. Rather, they are entirely consistent with the same
> limitations and impairments identified over multiple years and
> numerous visits.

(ECF No. 12 at 9-10). Lee also objects to the ALJ's stance that the opinions are largely internally

inconsistent:

> [T]he [S]tate [Agency] reviewers offered opinions consistent with
> the broader medical record and with the opinions of Dr. Wehri. Both
> initially and upon reconsideration, the state reviewers opined Ms.
> Lee was moderately limited in maintaining social functioning, as
> well as moderately limited in maintaining concentration,
> persistence, and pace. More specifically, the initial and
> reconsideration reviewers both opined Ms. Lee was moderately
> limited in her ability to maintain attention and concentration for
> extended periods; work closely to and getting along with others;
> complete a normal workday and workweek without psychological
> interruption; respond appropriately to supervisor criticism; and
> appropriately responding to changes in the workplace.

(ECF No. 12 at 11 (internal citations omitted)).

The Commissioner disagrees, noting that Lee "fails to point to any state agency opinion

that supports specific findings that the ALJ rejected …, such as the need for unscheduled breaks every fifteen minutes or to miss more than four days of work per month." (ECF No. 15 at 4). The Commissioner also objects to Lee's assertion that the ALJ's analysis of Wehri's opinions lacks substantial evidence. (ECF No. 15 at 4).

The ALJ analyzed four distinct categories of statements from Wehri; he accorded controlling weight to none of them. (ECF No. 11 at 531). Lee does not tackle these opinions one-by-one; rather, she broadly links Wehri's statements together to argue that Wehri's opinions are not inconsistent. (ECF No. 12 at 8-11). The commissioner, though, addressed each group of Wehri's statements individually—just as the ALJ did. (ECF No. 15 at 4-8). Because the ALJ accorded different weight to each group of distinct statements, the Court will address Wehri's statements as the ALJ did.

### 1.     The Treating-Physician Rule and Giving Good Reasons

A treating physician is "your own acceptable medical source[2] who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2). The regulations further state that a medical source is one who "is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law." 20 C.F.R. § 404.1502(d).

An ALJ is required to give a treating physician's qualifying medical opinions controlling weight if they: (1) are "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) not "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2) (repealed prospectively, 82 Fed. Reg. 15,132 (Mar. 27, 2017)). The

---

[2] A licensed medical or osteopathic doctor is an acceptable medical source. 20 C.F.R. § 404.1502(a)(1).

19

Commissioner will "always give good reasons in [its] notice of determination or decision for the weight [it] give[s to a claimant's] treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2). Good reasons are those that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether the ALJ followed the administrative regulations. *Cole*, 661 F.3d at 939.

If the ALJ fails to state his good reasons and how they affected the weight accorded to the treating-source's opinion, then it "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243. Such a failure requires remand. *Id.* But an ALJ's good-reasons narrative can be sufficient even though it is "brief" (*Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009)), "indirect[]" (*Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 471 (6th Cir. 2006)), or implied. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) ("[I]t is well settled that …an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts."). And if the ALJ narrates the conflicting medical evidence elsewhere in the record, then the ALJ is not required to restate the conflicting medical evidence when explaining how a treating source's opinion is inconsistent with that evidence. *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016). The Sixth Circuit holds that giving greater weight to a State

20

Agency consultant's opinion over an examining or treating source is "not, in and of itself, error." *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007). Instead, "[i]n appropriate circumstances, opinions from State [A]gency medical ... consultants … may be entitled to greater weight than the opinions of treating or examining sources." *Id.*

The Commissioner does not dispute that Wehri is a treating physician in a general sense; however, the Commissioner argues that the ALJ was not required to give controlling weight to Wehri's opinions for various reasons that relate to the treating-physician rule. These reasons are examined below.

### 2.      The FMLA Form

The Commissioner contends that the FMLA Form is not a *medical opinion* under 20 C.F.R. § 404.1527(a)(1). (ECF No. 15 at 4-5). The ALJ agreed, noting that the FMLA Form touched on "issues [that] are reserved to the Commissioner." (ECF No. 11 at 530).

20 C.F.R. § 404.1527(a)(1) defines medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). But medical statements that do not meet that definition, or that cover "issues reserved to the Commissioner" (typically "administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or decision of disability"), are medical-source statements. 20 C.F.R. § 404.1527(d). An ALJ "will not give any special significance" to medical-source statements, *i.e.*, they are not entitled to controlling weight under the treating-physician rule or the factors analysis at 20 C.F.R. § 404.1527(c). 20 C.F.R. § 404.1527(d)(3).

The FMLA Form's premise—that Lee cannot work because of her mental-health

symptoms—is an issue reserved for the Commissioner. Moreover, the FMLA Form provides scant information on Lee's mental impairments. For example, Wehri's limited narrative states that Lee "suffers from anxiety and depression, brought on by hyperhidrosis[; she] cannot work when having an anxiety attack," and that she "suffers from severe anxiety and depression [and, thus, is] unable to focus or work." (ECF No. 11 at 383-84). The FMLA Form does not reflect Wehri's judgment of Lee's impairments; thus, it is a medical-source statement that is not entitled to any special significance, including controlling weight.

The ALJ's decision to give the FMLA Form little weight because it is "internally inconsistent [and] unsupported by the record" is subject to substantial-evidence review. The ALJ states that "the doctor's opinion is internally inconsistent with his noted observations. The doctor frequently indicates in his treatment of [Lee] that she is alert and fully oriented, without mention of any other observable mental health symptom." (ECF No. 11 at 530). In reviewing Wehri's 2014-19 treatment notes, the Court observes references to mental health symptoms: panic-attack symptoms (ECF No. 11 at 354, 358); mood swings (ECF No. 11 at 410); difficulty sleeping (ECF No. 11 at 352, 356, 439); anxiety and nervousness (ECF No. 11 at 351, 352, 355); and forgetfulness (ECF No. 11 at 722). The Court observes references to stabilizing mental-health circumstances: panic disorder with improvement (ECF No. 11 at 357, 358); presenting as alert and oriented (ECF No. 11 at 350, 356, 357, 358, 440, 441, 442, 722, 725, 726, 727); having intact judgment and insight while showing no evidence of anxiety, depression, or agitation (ECF No. 11 at 353, 442, 505, 724); and satisfactory treatment indicators (ECF No. 11 at 443, 725). The Court observes past instances in which Lee failed to follow her prescribed medical regimens. (ECF No. 11 at 350, 351, 354, 355, 356). The Court observes references to smoking marijuana (to help regulate her hyperhidrosis) and cigarettes, which Wehri "think[s] … is a contributory to [Lee's] anxiety so we

are asking her to quit smoking completely…" (ECF No. 11 at 352). But the Court does not observe many mental-health symptoms during Wehri's treatment notes from March, April, or May 2015, the dates that correspond to the FMLA Form. (ECF No. 11 at 348-50).

Based on this review, the Court is satisfied that the ALJ's decision to give little weight to the FMLA Form is supported by substantial evidence. The ALJ asserted that the Wehri's cannot-work determination was both not a medical opinion and internally inconsistent. And a reasonable person might accept the ALJ's reasoning as adequate to support that conclusion. *Rogers*, 486 F.3d at 241. Because substantial evidence supports the ALJ's analysis, the court must affirm the Commissioner's findings, even if substantial evidence exists to support an alternative result. *Elam*, 348 F.3d at 125. Accordingly, the ALJ's analysis of the FMLA Form should not be disturbed.

### 3.    Wehri's Off-Work Notes

The ALJ considered numerous off-work notes. (ECF No. 11 at 530). He gave them "little weight, as they are limited in their duration and provide no functional analysis as to what limitations prevented [Lee] from working." (ECF No. 11 at 530). Although the ALJ states that these notes are in Exhibit 4F, the Court has located only one off-work note in that exhibit: It conclusorily states that Lee cannot work from February 12, 2015, through February 28, 2015, and that she will return on or about March 1.[3] (ECF No. 11 at 386). This note is not a medical opinion because it does not discuss either the nature or the severity of Lee's impairments; thus, it is not entitled to any specific weight. Lee does not claim that the ALJ's analysis for this document lacks substantial evidence; instead, she only tangentially references it in her controlling-weight argument. Thus, the Court does not need to address it further here, and the ALJ's analysis should

---

[3] Wehri's treatment notes mention other off-work notes; they appear to provide the same (albeit limited) detail as the February 2015 note. (*E.g.* ECF No. 11 at 348, 351, 417).

not be disturbed.

### 4.    The Physical Functional Capacity Assessments

The ALJ analyzed a 2015 Physical Assessment and a 2019 Medical Source Statement, both of which discuss Lee's physical capacity. Wehri's 2015 and 2019 assessments are medical opinions from a treating source (as defined above). Thus, Wehri's opinions in them are entitled to controlling weight unless they are: (1) not "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; or (2) "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). And were the ALJ to accord them less than controlling weight because they fail that test, then the ALJ would have to explain the weight accorded to them and support it with "good reasons." 20 C.F.R. § 404.1527(c)(2).

The ALJ gave these opinions collectively "some weight, as they are somewhat consistent with the record." (ECF No. 11 at 531). In giving the opinions some weight, the ALJ addressed four different points. The ALJ gave great weight to Wehri's opinion of Lee's ability to "stand, walk, and/or sit for eight hours each, throughout the work day[,] … as the record lacks any evidence of limitation in these areas." (ECF No. 11 at 531). He gave little weight, however, to Wehri's other opinions concerning unscheduled breaks, frequent work absences, and Lee's "ability to handle, finger, and reach." (ECF No. 11 at 531).

The Court finds that the ALJ's decision to give Wehri's opinion's less than controlling weight is supported by substantial evidence. The ALJ found that Wehri's opinions were inconsistent with the evidence in the case record—including Wehri's treatment notes. (ECF No. 11 at 531). Specifically, the ALJ found that Wehri's

> opinion that the claimant would require unscheduled breaks every
> fifteen minutes for up to five minutes is entirely unsupported by the
> record as a whole and is internally inconsistent with his own records
> (Id.). Similarly, the doctor opines that the claimant is limited to

24

> lifting up to ten pounds occasionally and can only handle and finger bilaterally for up to 5% of the workday and is able to reach bilaterally for up to 10% of the workday (Id.). The doctor attributes this significant limitation to the claimant's hands sweating constantly; however, the claimant reported that she has never dropped an item while shopping and indicated that's she is able to perform her household chores. Additionally, the record lacks any testing performed by the doctor that would support a limitation in this area. Therefore, the doctor's opinion regarding the claimant's ability to handle, finger, and reach is given little weight. Finally, the doctor opines that the claimant would be absent from work more than four times per month (Id.).

(ECF No. 11 at 531). These noted inconsistencies are supported by substantial evidence, as a reasonable person might accept them as adequate to support the ALJ's conclusion that the opinion is inconsistent with other substantial evidence in the case record. *Rogers*, 486 F.3d at 241. Lee has not demonstrated that these particular inconsistencies lack substantial evidence—and it is her burden here to do so. *Oliver*, 804 F.2d at 966.

As the ALJ gave Wehri's opinions less than controlling weight, the ALJ had to give good reasons for the weight accorded to the opinions. Thus, the Court will examine the ALJ's good-reasons analysis for the three opinions that were given little weight.

### a.     Unscheduled Breaks

Wehri opined that Lee would need unscheduled breaks every fifteen minutes during an eight-hour shift, with each break lasting one-to-five minutes. (ECF No. 11 at 402). The ALJ thoroughly summarized Lee's medical records and did not discuss Wehri or another doctor indicating that Lee would require frequent, unscheduled breaks. For example, the ALJ noted that Wehri in an April 2015 appointment with Lee discussed Lee's "sweaty hands, [but] the physical examination completed at that time was unremarkable." (ECF No. 11 at 528). Similarly, the ALJ wrote that Wehri, in recording his May 2015 appointment with Lee, stated that Lee "ha[d] excessively sweaty palms and [that] she seemed anxious; however, the remainder of the exam was

unremarkable." (ECF No. 11 at 528). The ALJ contrasted these unremarkable findings with Wehri's decision to write numerous off-work notes, including a note for a three-month absence. (ECF No. 11 at 528). During a July 2015 psychological consultation, Lee did not outwardly display hyperhidrosis symptoms. (ECF No. 11 at 528). And the ALJ noted that Wehri's treatment notes from late 2015 do not discuss Lee's mental-health status. (ECF No. 11 at 528). These records, which are contemporaneous to Wehri's 2015 Physical Functional Capacity Assessment, are silent on Lee's need for breaks.

Based on this review of the record, the Court finds that the ALJ's good reasons for giving Wehri's opinion little weight are supported by substantial evidence. While Lee argues that there is substantial evidence to support an unscheduled-breaks limitation, Lee failed to cite any evidence in the record in her brief on this point. (*See* ECF No. 12 at 9). The record's silence on this issue supports the ALJ's good reason for discounting the limitations as unsupported by the record. Additionally, Wehri's opinion on this matter is inconsistent with his earlier notes because none of them states that Lee needs frequent breaks or explains why she would need them. Accordingly, the Court should not disturb the ALJ's logically drawn and substantially supported analysis. *Elam*, 348 F.3d at 125.

### b.    <u>Ability to Handle, Finger, and Reach</u>

Wehri also opined in the 2015 statement that Lee's hyperhidrosis in her hands caused her an extreme limitation in her ability to reach, handle, and finger. (ECF No. 11 at 402). According to Wehri, Lee can grasp, turn, or twist objects only five percent of the time; finely manipulate only five percent of the time; and reach with her arms only ten percent of the time. (ECF No. 11 at 402).

Wehri's 2019 statement opined the same limitations.[4] (ECF No. 11 at 767-69). The ALJ accorded little weight to Wehri's lifting and manipulation limitation because Lee reported during her testimony "that she has never dropped an item while shopping and indicated that she is able to perform her household chores." (ECF No. 11 at 531). Additionally, the ALJ noted that "the record lacks any testing performed by the doctor that would support a limitation in this area." (ECF No. 11 at 531).

Substantial evidence supports the ALJ's decision to accord this limitation little weight. First, Lee's testimony casts doubt on Wehri's opinion. When asked if she had ever mishandled an item while shopping, Lee said "[n]ot in the store." (ECF No. 11 at 551). It is reasonable for the ALJ to see the contrast between Wehri's opinion and Lee's testimonial assertion and deduce that Lee would have mishandled items while shopping if Wehri's percentages were correct. Second, although claimants are not required to provide objective medical evidence (20 C.F.R. § 404.1529(c)(2)), a treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" to receive controlling weight. 20 C.F.R. § 404.1527(c)(2). Here, the record lacks objective medical evidence that would Wehri's suggested limitation. Wehri's treatment notes indicate that Lee's symptoms are significant—he referred her to a specialist for therapeutic Botox injections (ECF No. 11 at 348-50)—but Wehri does not discuss specific handling, fingering, or reaching limitations in his treatment notes. The ALJ summarized an examination by Kuhlman, a consultant who examined Lee's hyperhidrosis, by saying that Lee's "axilla, palmar aspects of the hands, fingers, and thumb, and palmar aspects of the feet and toes"

---

[4] There, he opined that Lee could reach occasionally, handle rarely, and finger rarely. (ECF No. 11 at 767-69). The opinion defines *occasionally* as "up to 1/3 of the time—up to 2 1/2 to 3 hours per day," and *rarely* as "no more than 10 percent of the day—less than 1 hour per day." (ECF No. 11 at 767).

experienced severe hyperhidrosis, but Kuhlman did not quantify the extent to which these symptoms would limit Lee's ability to handle, finger, or reach in a workplace setting, either. (ECF No. 11 at 528).

Considering all of this, a reasonable person might accept the ALJ's analysis as adequate to support giving little weight to this limitation. *Rogers*, 486 F.3d at 241. Thus, it is supported by substantial evidence. Furthermore, Lee's testimonial assertion and the record's lack of objective medical evidence are good reasons for giving the opinion little weight, as they are "sufficiently specific to make clear to any subsequent reviewers … the reasons for th[e] weight" given. SSR 96-2p. Although it may also be reasonable to conclude that Lee's other testimony concerning mishandling objects at home (ECF No. 11 at 551) would further corroborate Wehri's opinion, the Court cannot disturb the ALJ's analysis if it supported by substantial evidence, even though substantial evidence might support another conclusion. *Elam*, 348 F.3d at 125. The ALJ enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen*, 800 F.2d at 545. This is such a decision.

### c.  <u>Frequent Absences</u>

The ALJ also rejected Wehri's opinion that Lee would miss four or more days per month. (ECF No. 11 at 530). The ALJ's finding here, too, is supported by substantial evidence. Wehri noted in February 2015 that he wrote an off-work note for Lee because Lee thought that working was "contributing to her anxiety;" thus, she wanted "to be off work for a while." (ECF No. 11 at 352). Indeed, Wehri noted that Lee was "struggling a lot, [having] difficult[y] going to work, staying at work, [is] feel[ing] anxious, [is] worked up a lot[,] and [is having] difficulty performing tasks." (ECF No. 11 at 352). A few weeks later, Wehri wrote that Lee "[s]till has some anxiety, she has been off work since last time, [she is now] asking if she could go on social security

28

disability, I have discouraged her from attempting that." (ECF No. 11 at 351). Yet, Wehri continued writing off-work notes—and for increasingly longer periods of time. (*E.g.* ECF No. 11 at 351 (two weeks), 349 (one month), 348 (three months)).

Wehri did not explain in the physical assessment why Lee would be absent so frequently. (ECF No. 11 at 403). And Wehri's treatment notes and off-work notes do not explain why he opines that Lee would miss more than four days of work per month, either; they show that Wehri was skeptical about Lee's disability claim and that Lee asked for notes that would excuse her from work, which Wehri continued to write. The record's lack of objective support for these frequent absences is a good reason to reject this limitation. The ALJ's finding is supported by substantial evidence because it is logically drawn from the record and a reasonable person might accept it as support for that conclusion. *Elam*, 348 F.3d at 125.

### 5.     The Mental Functional Capacity Assessment

The ALJ analyzed Wehri's 2015 Mental Capacity Assessment. In it, Wehri opined that Lee's sustained-concentration-and-persistence ability was markedly impaired in four sub-areas and extremely impaired in one sub-area. (ECF No. 11 at 405-06). Wehri also opined that Lee was markedly impaired in three areas of social-interaction functioning. (ECF No. 11 at 406). Wehri did not, however, "[d]escribe the medical/clinical findings that support th[at] assessment" despite the form asking him to do so. (ECF No. 11 at 406). Ultimately, the ALJ gave this opinion "little weight, as it is an opinion on an area outside of [Wehri's] expertise and is unsupported by the record as a whole." (ECF No. 11 at 531).

Concerning the ALJ's good reasons, an opinion that strays beyond a practitioner's area of expertise is a *good reason* that justifies giving that opinion less than controlling weight. *Dawson v. Comm'r of Soc. Sec.*, No. 1:09-cv-456, 2011 WL 8004180, at *5 (S.D. Ohio Jan. 10, 2011); *see*

*also* 20 C.F.R. § 404.1527(c)(5) ("Specialization. We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). To that end, the ALJ noted that, "at the outset, Dr. Wehri's education as a general practitioner may have included some training regarding mental health treatment," but that "there is no indication that he has specialized training in mental health treatment." (ECF No. 11 at 531). Lee has not shown that Wehri is specialized in mental-health treatment; thus, Wehri's opinion on this matter is less reliable than would be a specialist's opinion. 20 C.F.R. § 404.1527(c)(5).

Relatedly, the ALJ stated that Wehri's "opinion is in sharp contrast to other opinions contained in the record that were issued by individuals who specialize in mental health treatment." (ECF No. 11 at 531). The ALJ is correct. The State Agency psychological consultants determined that Lee was moderately—but not markedly—impaired in her abilities to socially function and maintain concentration, persistence, and pace. (ECF No. 11 at 79-80, 94-95). The Court notes that Lee now attempts to draw support for Wehri's conclusions that Lee is *markedly impaired* from the opinions of the consultants. (ECF No. 12 at 11) (declaring that, "even with an incomplete record, the state reviewers offered opinions consistent with the broader medical record and with the opinions of Dr. Wehri"). This is unpersuasive: Wehri opined a different level of mental functioning than did the State Agency psychological consultants.

Ultimately, the ALJ's decision to accord little weight to Wehri's mental functioning opinion is supported by substantial evidence. Wehri did not support his opinion and the record does not support the marked limitations that Wehri opined. Moreover, Wehri is not a mental-health practitioner, so his opinion is less reliable than a mental-health practitioner's opinion. Thus, the ALJ's weight finding for this opinion should not be disturbed.

6.      **RFC Analysis**

Lee asserts that the ALJ's failures to accord controlling weight to Wehri's opinions affects

Lee's RFC. (ECF No. 12 at 12-13). Prior to determining that Lee could not perform past relevant

work at Step Four, the ALJ determined Lee's RFC. (ECF No. 11 at 525). The RFC determination

sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. §

416.945(a). Here, the ALJ determined that Lee has the RFC:

> to perform a full range of work at all exertional levels but with the
> following nonexertional limitations: Postural limitation of no
> climbing of ladders, ropes, or scaffolds. Environmental limitation to
> avoid all exposure to hazards, such as dangerous moving machinery
> and unprotected heights. The claimant can frequently, but not
> constantly, engage in work activities that challenge coping skills and
> stress tolerance, after being provided with explanations of the work
> process. Is able to attend, concentrate, adapt, and persist in a setting
> that has short cycle tasks, with routine changes in a workplace that
> have at most moderate time, pace and production demands. Work
> limited to simple, routine, and repetitive tasks. Brief, superficial,
> occasional interaction with the general public, coworkers, and
> supervisors.

(ECF No. 11 at 525). When supported by substantial evidence and reasonably drawn from the

record, the Commissioner's factual findings are conclusive—even if this court might reach a

different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§

405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree

with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*

*v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case *de*

*novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within

which to decide cases without being second-guessed by a court. *Mullen*, 800 F.2d at 545.

As discussed above, the ALJ considered and fully explained the weight given to Wheri's

opinion. This decision was supported by substantial evidence. The ALJ then included in the RFC

those limitations that he determined were supported by the record. The ALJ addressed Lee's ability to handle, finger, and reach by limiting her to "no climbing of ladders, ropes, or scaffolds." (ECF No. 11 at 525). This addition to the RFC is supported by substantial evidence because Lee is limited in this area to some degree, but the ALJ was not required to accept Wehri's limitation as discussed above. Similarly, the ALJ considered but did not adopt Wehri's limitations on absenteeism and unscheduled breaks. (ECF No. 11 at 531). The ALJ gave these opinions little weight because they were unsupported by the record and inconsistent with Wehri's treatment notes, which was supported by substantial evidence. Thus, the ALJ was not required to adopt the limitations in Lee's RFC, and their absence is not error. Finally, Lee asserts that the ALJ failed to properly address Lee's concentration issues as Wehri opined them. But the ALJ was not required to adopt Wehri's opinion because he gave it only little weight. In contrast, the ALJ gave great weight to the State Agency psychological consultants' opinions. (ECF No. 11 at 532). As the ALJ summarized them, the consultants opined that Lee

> is able to attend, concentrate, and persist in a setting that has short cycle tasks and, at most, a moderate pace demand; she is able to interact with the general public, coworkers and supervisors in a brief, superficial, and occasional manner; and she can adapt to routine changes in the workplace that has, at most, a moderate time and production demand…

(ECF No. 11 at 532). The ALJ adopted these limitations in the RFC.

The ALJ's decision whether or not to include limitations based on all of the evidence is supported by substantial evidence and reasonably drawn from the record. *See Mullen*, 800 F.2d at 545. Accordingly, Lee's first assignment of error is without merit, and I recommend that the Court affirm the ALJ's analysis of Wehri's opinions.

### C.  The ALJ's Analysis of Barwick's Examination Report

Lee's second assignment of error concerns the ALJ's analysis and application of Barwick's

consultative psychological evaluation. (ECF No. 12 at 15). The ALJ gave Barwick's opinion *some weight* because it was "somewhat consistent with the record as a whole." (ECF No. 11 at 530). The ALJ read Barwick's opinion to "indicate that [Lee] retains the ability to understand, remember, and carry out instructions and respond appropriately to supervision and coworkers." (ECF No. 11 at 530). The ALJ then noted that "the record supports further limiting the claimant." (ECF No. 11 at 531).

Lee contends that the ALJ failed to address Barwick's opinion in two areas: (1) Lee's ability to maintain attention, concentration, persistence, and pace while performing simple and multi-step tasks; and (2) Lee's ability to respond appropriately to work pressures in a work setting. (ECF No. 12 at 14-15). Lee reads Barwick's statement—that Lee "lacks capacity"—to mean that Lee "*cannot* perform in a work setting where she has to maintain attention, concentration, persistence or pace; … also, [that she] *cannot* appropriately respond to work pressures." (ECF No. 12 at 15 (emphasis added) (citing ECF No. 11 at 395)). And because the ALJ stated that "the record supports further limiting" Lee's RFC in those areas of functioning, Lee contends that the ALJ's RFC is legally insufficient in that it did "not mention any areas in which Ms. Lee lacks capacity." (ECF No. 12 at 14-15).

Lee's argument is flawed in two ways. First, Lee's premise—that the ALJ was obligated to endorse Barwick's opinion as written because he gave it *some* weight—is incorrect. Barwick offered a consulting opinion. (ECF No. 11 at 530). "There is no legal requirement for an ALJ to explain each limitation or restriction [s]he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight." *Smith v. Comm'r of Soc. Sec.*, No. 5:11-cv-2104, 2013 WL 1150133 (N.D. Ohio, Mar.19, 2013). Moreover, fashioning the RFC is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(2). Thus, the ALJ was not

obligated to adopt Barwick's opinion as Barwick wrote it.

Second, Lee interprets Barwick's opinion to indicate that Lee lacked all capacity. (ECF No. 12 at 14-15). Lee argues that, because the ALJ relied on this opinion to some extent and suggested that Lee was further limited, the ALJ was required to include the lack-of-capacity limitations in the RFC. (ECF No. 12 at 14). Lee argues the ALJ mischaracterized Barwick's words. According to Lee, Barwick's opinion cannot be read as the ALJ summarized it: "The claimant *may struggle* with maintaining attention, concentration, persistence, or pace and with responding appropriately to work pressures." (ECF No. 11 at 530). Lee claims "[t]his is an inaccurate reading of the record. The consultative examiner does not suggest that Ms. Lee 'may struggle' in these areas, but that Ms. Lee 'lacks capacity' in these areas." (ECF No. 12 at 15).

Lee is incorrect. Barwick's narrative of Lee's ability to concentrate, persist, and maintain pace specifically states that Lee *may struggle*, and it does not state that she lacks all capacity:

> Lee was able to follow conversationally but did require some redirecting as she exhibited a somatic focus. She was able to calculate four iterations of serial sevens without error and calculated serial threes with one error in seventeen seconds. Given her anxiety and preoccupation with somatic symptoms, she *may struggle* with attention and concentration skills. Examination findings indicate that she lacks capacity in this area.

(ECF No. 11 at 395 (emphasis added)). This context shows that Barwick sees Lee as capable of concentrating, persisting, and maintaining pace to *some* extent—just not to the fullest extent. Similarly, concerning Lee's ability to respond to work pressures, Barwick wrote that

> Lee exhibited relatively poor insight into her current difficulties. She did appear anxious and distressed and it is likely that she *would struggle* to identify the appropriate origin of her distress and therefore *struggle* to cope. Examination findings indicate that she lacks capacity in this area.

(ECF No. 11 at 395 (emphasis added)). That narrative, too, demonstrates that Lee is at least

34

somewhat capable of responding to work pressures.

In that context, it is reasonable and logical to conclude—as the ALJ did—that Lee "may struggle with maintaining attention, concentration, persistence, or pace and with responding appropriately to work pressures." (ECF No. 11 at 530). Thus, the ALJ's evaluation of Barwick's opinion is supported by substantial evidence.

Lee further argues that the ALJ erred by not including the lack-of-capacity limitations in the RFC, and that an RFC that included such limitations would significantly affect Lee's disability claim. (ECF No. 12 at 16). However, as discussed above, the Court finds that substantial evidence supports the ALJ's evaluation of the opinion and his determination that the opinion did not suggest a full lack of capacity. Therefore, substantial evidence supports the ALJ not including the lack-of-capacity limitations in the RFC. The ALJ appropriately included the limitations that he found to be supported by the record and substantial evidence supports his findings. *See Mullen*, 800 F.2d at 545; *see also Selzer v. Comm'r of Soc. Sec.*, 1:16 CV 276, 2016 WL 11264703, at *4 (N.D. Ohio Dec. 20, 2016) (Even when an ALJ gives an opinion great weight, she is not required to include each finding and every limitation from that opinion in the RFC.).

The Court must affirm the ALJ's decision if his "findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision." *Elam*, 348 F.3d at 125. The ALJ enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen*, 800 F.2d at 545. Accordingly, Lee's second assignment of error is without merit. I recommend that the Court affirm the ALJ's analysis of Barwick's opinion.

## VII.    Recommendation

Because the ALJ followed proper procedures and his decision is supported by substantial evidence, I recommend that the Commissioner's final decision denying Lee's application for disability insurance benefits be AFFIRMED.

DATED: 12/16/2020

*Carmen Henderson*
_____

Carmen E. Henderson
United States Magistrate Judge

_____

OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); see also *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

36